## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL PELUSO,<br>(TDCJ-CID #01371492) | § | |
| | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-0867 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

The petitioner, James Michael Peluso, seeks habeas corpus relief under 28 U.S.C. § 2254,

challenging four 2011 state felony convictions.   The respondent filed a motion for summary

judgment, (Docket Entry No. 8), with a copy of the state court record.  (Docket Entry No. 7).  Peluso

filed a response. (Docket Entry No. 10).  Based on careful consideration of the pleadings, the motion

and response, the record, and the applicable law, the court grants the respondent's motion and, by

separate order, enters final judgment.  The reasons are set out below.

I.     **Background**

Peluso pleaded guilty in Texas state court in 2010 to unauthorized use of a motor vehicle;

failing to stop and render aid; evading arrest, resulting in serious bodily injury; and aggravated

assault with a deadly weapon. (Cause Number 10-04-0344-CR).  (Docket Entry No. 7-2, pp. 63-90).

Peluso also pleaded true to an enhancement paragraph alleging to a prior conviction for burglary of

a habitation. (Cause Number 04-12-10385-CR).  In January 2011, the jury sentenced Peluso to serve

two years for unauthorized use, ten years for failing to stop and render aid, 19 years for evading

arrest resulting in serious bodily injury, and 55 years for aggravated assault.  The Ninth Court of

Appeals of Texas affirmed the convictions and sentences in June 2012. That court briefly summarized the facts, as follows:

> Officer Johnson attempted to stop James Michael Peluso's vehicle after Peluso ran a red light. Peluso was driving a stolen truck. He led Johnson on a high-speed chase through city streets. During his flight, Peluso ran stop signs and stop lights. The chase ended when he drove the truck into another vehicle. He attempted to flee the scene of the crash but was stopped by Johnson. One of the occupants of the other vehicle was injured in the wreck.

(*Id.* at *1). The Texas Court of Criminal Appeals refused Peluso's petition for discretionary review in October 2012. Peluso filed an application for state habeas corpus relief in September 2013, which the Texas Court of Criminal Appeals denied without written order, on findings of the trial court, without a hearing in March 2014. (Docket Entry No. 7-18, *Ex parte Peluso,* Application No. 80-982-01, p. 1).

In April 2014, this court received Peluso's federal petition. Peluso contends that his conviction is void because his state trial counsel, Katherine Shipman, rendered ineffective assistance by:

(1)    failing to call his mother and children to testify in his behalf at the punishment phase of trial;

(2)    failing to present evidence of his "'adjustment disorder'" during the punishment phase; and

(3)    advising Peluso to enter his guilty plea without an agreed punishment.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 6-7).

Each ground for relief is examined below under the legal standards that apply.

## II.     The Applicable Legal Standards

Peluso's petition for a writ of habeas corpus is reviewed under the federal habeas statutes as

amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. §

2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002).

The AEDPA provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

> (e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Subsections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of

fact, questions of law, and mixed questions of fact and law that result in an "adjudication on the

merits."  An adjudication on the merits "is a term of art that refers to whether a court's disposition

of the case is substantive, as opposed to procedural."  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir.

2000).

A state-court determination of questions of law and of mixed questions of law and fact is

reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved

an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000). A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495. In deciding whether a state court's application was unreasonable, a federal court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000). The state court's factual findings are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express factual findings, but also to the state court's implicit findings. *Garcia,* 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) — which mandates that findings of fact made by a state court are "presumed to be correct" — overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence," as to the state court's findings of fact must be accepted as correct. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

Peluso is a *pro se* petitioner. *Pro se* habeas petitions are construed liberally and are not held to the same stringent and rigorous standards as lawyers' pleadings. *See Martin v. Maxey*, 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti*, 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This court broadly interprets Peluso's state and federal habeas petitions. *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999).

## III.    The Claim that Trial Counsel Provided Ineffective Assistance

To prevail on an ineffective-assistance claim, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the petitioner suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668 (1984); *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001). The district court may dispose of a claim if the performance was not constitutionally deficient or no prejudice is shown. A court need not address the reasonableness component first. If a petitioner fails to make one of the required showings, the court need not address the other. *Strickland*, 466 U.S. at 697.

In assessing counsel's performance, the court must presume that it falls within the "wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993). If counsel's challenged actions are based on well-informed strategic decisions, they are "well within the range of practical choices not to be second-guessed." *Rector v. Johnson*, 120 F.3d 551, 564 (1997) (quoting *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied*, 509 U.S. 921 (1993)).

To show prejudice, a convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. An attorney's strategic choices based on information supplied by the defendant and gathered from an investigation of the relevant law and facts "are virtually unchallengeable." *Strickland*, 466 U.S. at 691.

In the habeas context, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." The standards *Strickland* and § 2254(d) set are 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86 (2011) (citations omitted). Because the "*Strickland* standard is a general one," "the range of reasonable applications is substantial." *Id.*

Each of the three aspects of Peluso's ineffective assistance claim is analyzed separately.

## A.     The Claim that Counsel was Deficient in Failing to Call Certain Witnesses

Peluso alleges that he told his court-appointed attorney, Katherine Shipman, that he wanted his mother, Mary Peluso, and his children to testify on his behalf during the punishment phase.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, p. 6). Peluso states that had they testified, his punishment would have been less harsh.

Mary Peluso's affidavit filed in the state habeas court stated as follows:

> I am James Michael Peluso's mother and he is my youngest son. James's trial attorney never contacted me about being a character witness. If she had I would have been more than glad to take the stand. In fact I would of insisted in doing so because it would have helped the jury understand the reality of James's situation. I would of  explained that James is not a bad person but he does have a problem with drugs. His children love him dearly and it is there[sic] best intrest[sic] that James get the help htat[sic] he needs, not excessive periods of incarceration. James made a mistake and he admits that. He accepts the fact what he did was wrong and understands that punishment is necessary. I have dealt with James's drug problems for years. When he doesn't do drugs he is a great person and a wonderful father. Please remember that people on drugs do stupid things. I believe that if I was given the opportunity to testify as a character witness at James's sentencing he would not have recieved[sic] the accesive[sic] sentence that he currently has because the jury would have been adequately and equally informed.

(Docket Entry No. 1-2, p. 2).

Peluso argues that the absence of character witnesses at the sentencing phase resulted in a harsher sentence than he otherwise would have received. Peluso states that he provided Shipman with his mother's contact information and that Shipman tried to call her on Tuesday, October 12, 2010. Peluso alleges that Shipman did not try to contact her again for over three months, until just a few days before trial. Peluso contends that there is no evidence that his mother would have testified in negative ways because he was estranged from her. To the contrary, he alleges that he received visits from his mother in county jail and that she sent him commissary money.

In an affidavit filed in the habeas court, Shipman answered certain questions, as follows:

Did you interview the applicant's mother, Mary Peluso, prior to trial? Did you speak to Mary Peluso regarding her willingness to testify and the probable subject matter of her testimony? If you did not, please state why you did not. If you did, please state what you learned from Mary Peluso and why you ultimately chose not to call her as a witness.

I did not interview Mary Peluso prior to trial. When I first asked Mr. Peluso for a list of witnesses who might testify on his behalf, he told me that there was not anyone. On September 10, 2010, I sent Mr. Peluso a letter, asking him for a list of possible witnesses if his case were to go to trial. He did not respond to my request. It was not until I met with him in person about a month later, and told him that I needed someone, anyone, who might be willing to testify on his behalf that he gave me his mother's contact information. I called Mary Peluso at the number provided to me by James Peluso. I know for certain that I attempted to contact Mary Peluso on the following dates:

October 12, 2010 January 24, 2011 January 24, 2011 (a second attempt that day) January 25, 2011 January 26, 2011

I believe that I called Mary Peluso on other days between October 12, 2010 and January 24, 2011, but I did not record them in my file. I often make telephone calls from my cell phone when I do not have a client's file in front of me, and so the call goes unnoted in the client's file. I sometimes forget to notate phone calls in a client's file if there is not an actual conversation. When I called the number Mr. Peluso gave me, I would get an answering machine, and the voice on the answering machine would be a female voice. It was obviously a recording from a real person, rather than a generic recording. It is my practice to always leave a message if an answering machine picks up. It is my practice to leave my name, telephone number, and to identify the specific reason that I am calling. I remember leaving numerous messages for Mary Peluso, and leaving messages about her being a possible witness for James at trial. Mary Peluso never returned my calls. I asked Mr. Peluso if he had the correct contact information and he told me that he did. When I spoke to James Peluso, and informed him that his mother was not returning my calls, he was not surprised. During our conversations, Mr. Peluso indicated that he was somewhat estranged from his family, and that he did not expect for them to come to his aid. I did not have a subpoena issued and have Mary Peluso served with a subpoena because I believed that she

would be a hostile witness, especially after she did not return multiple phone calls. As a part of my trial strategy, I did not want to subpoena a witness who I believed to be hostile to Mr. Peluso, calling the prosecutor's attention to their identity and whereabouts. It is my practice to ask clients to have any witnesses that they believe might be helpful in their defense, either as a fact witness or a character witness to contact me so that I might interview them in preparing their defense. No one ever contacted me regarding Mr. Peluso.

(Docket Entry No. 7-16, pp. 48-49).

The state habeas court entered the following findings:

> 5.   The Court is familiar with the effective performance of the applicant's attorney at the time of his trial, Ms. Katherine Shipman, who has long practiced in the courts of Montgomery County and is well-qualified for appointment as trial counsel in serious felony cases.

> 6.   Shipman has submitted a credible affidavit in answer to the applicant's claims of deficient performance.

> 7.   The applicant's mother, Mary Peluso, refused to return Shipman's phone calls and could not be spoken to in advance of trial.

> 8.   Based on the applicant's representations to Shipman, Shipman had reason to believe that Mary Peluso would not testify favorably for the applicant.

(Docket Entry No. 7-17, p. 9).

The state habeas court concluded:

> 2.   The applicant has failed to prove by a preponderance of the evidence that he was denied his right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 669 (1984); *Hernandez v. State,* 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

> 3.   Shipman's performance fell within acceptable norms of professional conduct.

4.  Shipman's advice to plead guilty and ask the jury for mercy was competent advice given the strength of the State's case.

5.  Shipman and the applicant jointly chose a defense that did not rely on the presentation of mitigating evidence.

6.  The strategic decisions of counsel are due deference. *See Ex parte Kunkle,* 852 S.W.2d 499, 505-06 (Tex. Crim. App. 1993).

7.  Shipman was not ineffective for choosing the strategy that she did.

8.  The applicant is not entitled to habeas corpus relief.

(Docket Entry No. 7-17, p. 10).

The Court of Criminal Appeals expressly based its denial of habeas relief on these findings. These determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). Peluso has not produced clear and convincing evidence to rebut these findings.

Counsel is entitled to a presumption that his performance was adequate. Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy. *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000) (citing *United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983)). There is no basis other than speculation to support Peluso's argument that the trial outcome would have been different had his mother or children testified. Potential character evidence from a mother and daughters is not the type of evidence that would offer an excuse for the conduct at issue or reduce the punishment. Peluso has not explained why the jury would have reached a different result if his mother had testified.

The Fifth Circuit has rejected similar arguments. In *Lamb v. Johnson,* 179 F.3d 352 (5th Cir. 1999), the court considered trial counsel's testimony "that he made a strategic decision not to put

mitigating witnesses on the stand to testify" on the defendant's behalf. Counsel "explained that he believed a plea for mercy would come better from his counsel than from friends and family whom [the defendant] had not seen or dealt with in several years. [Counsel] further posited that, in his opinion, the jury would have looked at such testimony very skeptically considering (1) the brutal nature of the crime he was on trial for in Texas; (2) the crime he had committed in Florida; (3) the continuous criminal history of being in trouble with the law since he was a juvenile; and (4) his previous conviction in Arkansas. Finally, [counsel] explained that he had believed that a strategy of mitigating witnesses might backfire as it might harden the jury against [the defendant] and invite prosecutorial attack. [Counsel] pointed out that the witnesses would have been vulnerable to "have you heard" types of questions by the prosecution, thus putting before the jury [the defendant's] non-violent but nonetheless criminal juvenile record. All in all, Davis testified that he made a strategic decision not to introduce mitigating witnesses." (*Id.*).

The court continued:

> Informed strategic decisions of counsel are given a heavy measure of deference and will not be second guessed. *See Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.), *cert. denied,* 522 U.S. 944, 118 S. Ct. 361, 139 L. Ed.2d 281 (1997); *Boyle,* 93 F.3d at 187. Moreover, "a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *See Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir. 1997) (citing *Mann v. Scott,* 41 F.3d 968, 983-84 (5th Cir. 1994)), *cert. denied,* 522 U.S. 1120, 118 S. Ct. 1061, 140 L. Ed.2d 122 (1998). Viewing [the defendant's] trial counsels' strategic decision through the lens of *Rector* and *Mann* makes it apparent that [the defendant] cannot prevail on his *Strickland* claim. . . .
>
> [The defendant] also argues that his trial counsels' explanation – that they did not want to use mitigating witnesses because they could have been impeached with "have you heard" questions – was based on an

erroneous understanding of the law.  He contends that, under Texas law, such questions are only allowed as to a reputation witness and would not be admissible to impeach witnesses who stated a personal opinion as to the accused's background.  *See Rutledge v. State,* 749 S.W.2d 50 (Tex. Crim. App. 1988).  *Rutledge* does state that "have you heard" questions are properly utilized to impeach a witness who claims a familiarity with hearsay as to the defendant's reputation, and that a witness who testifies to his personal knowledge of the defendant's character cannot be impeached with "have you heard" questions.  *See* 749 S.W.2d at 53.  [The defendant's] proposed witnesses were not reputation witnesses.  According to the proposed content of their testimony, they would be testifying about their personal knowledge of [his] lack of violence.  [The defendant] therefore is correct that these witnesses would not have been subject to "have you heard" questions.

However, his attorneys were not incorrect in their opinion that the mitigation witnesses could have been asked about their personal knowledge of [his] . . . record.  In *Livingston v. Johnson,* 107 F.3d 297 (5th Cir.), *cert. denied,* 522 U.S. 880, 118 S. Ct. 204, 139 L. Ed.2d 141 (1997), counsel decided against calling several suggested witnesses because, as counsel explained, anyone who knew the defendant well enough to testify to his good character would also know about his prior bad acts.  *See id.* at 308.  We agreed that this was plausible trial strategy.  *See id.*  In *McCoy v. Lynaugh,* 874 F.2d 954 (5th Cir. 1989), counsel did not call the proposed punishment witnesses because counsel was concerned about opening the door to allow the State to inquire into instances of prior bad acts of the defendant.  *See id.* at 964.  We concluded that counsel's actions did not fall outside the wide range of professional assistance.  *See id.*
. . .

We find that [the defendant] cannot make a substantial showing that his trial counsel performed deficiently under *Strickland.*

*Lamb v. Johnson*, 179 F.3d 352 (5th Cir. 1999).

The jury in the present case had already heard extensive evidence about Peluso's criminal history in Pennsylvania and Texas.  On cross-examination, Peluso, then 37, admitted that he had been in trouble with the law since he was 22.  The State presented the testimony of records

custodians from the Harris County and Montgomery County Jails about Peluso's prior judgments, arrest reports, and guilty pleas.  The State also presented a fingerprint expert whose testimony linked Peluso to the judgments.  Counsel made a tactical decision to acknowledge Peluso's criminal history and plead for mercy.

Counsel solicited names of possible witnesses from Peluso.  Counsel tried unsuccessfully to contact Peluso's mother.  After making several calls and getting no response, counsel reasonably determined that Peluso's mother was unwilling to testify and if subpoenaed, would likely be a hostile witness.

At trial, Peluso testified that he did not have a good relationship with his father or mother.  Peluso testified that he had been living on the same property as his parents and that a few days before the offense, he argued with his father who ordered him to leave.  Peluso gathered his belongings and walked away.  A stranger named "Kyle" picked him up and gave him a ride to a motel, where Peluso began using drugs.  Peluso testified that he took drugs on the date of the offense and was driving to get more when his high-speed dangerous effort to fee from the police occurred.  Peluso acknowledged that he had a serious drug problem, and he needed help.  He testified that he knew he belonged in prison.  He pleaded for an intermediate sentence so that he could see his children grow up.  Peluso testified that his mother did not talk to him while he was in prison, but she did allow him to speak to his children.

Peluso's defense counsel reasonably determined that calling the mother as a witness in the punishment would not have been beneficial for the defense.  Counsel could reasonably have determined that the mother would have given at least some unfavorable testimony; that the jury would view her testimony with skepticism, given her relationship to her son; and that the prosecutor

would ask her about her son's extensive criminal history. Counsel reasonably decided to make her own plea for mercy rather than call Mary Peluso to try to do so. The record supports the state habaeas court's decision that this was a strategic choice.

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law. Peluso has not shown that he is entitled to the relief he seeks. 28 U.S.C. § 2254(d)(1).

### B.  The Claim that Counsel was Deficient in Failing to Present Evidence of Prior Psychiatric Illness

Peluso alleges that psychiatrists have diagnosed him with "Adjustment Disorder with Depressed Mood" and that his mental records establish that he has a history of impulsive acting out, although always with provocation. Peluso alleges that his medical records establish that he has impaired judgment due to his emotional instability and dysphoria. He alleges that he had previously voluntarily admitted himself to psychiatric care by going to the emergency room complaining of confusion. Peluso alleges that his counsel did not ask him about any medical or psychiatric history, did not seek his records, and did not present this mitigating evidence to the jury. Peluso contends that counsel had an obligation to ask about any psychiatric history and that his counsel did not do so. He argues that his emotional instability and dysphoria was apparent to anyone, and that counsel had an obligation to present this mitigating evidence because it explained that he was not a bad person or a criminal, but instead one who suffered from psychiatric problems.

In her affidavit, defense counsel responded to certain questions as follows:

> 2.  During your investigation into the facts of this case, did you conduct any inquiry into the applicant's mental health history? If yes, please state what you learned. If you did not, please state why you felt it was unnecessary.

In speaking with Mr. Peluso, he was always lucid, spoke intelligently, had a firm grasp of the facts of his case, and a clear memory of the events of March 21, 2013. It is my practice to ask clients whether they suffer from any mental health problems or mental illness, and to make a notation of any affirmative responses in the client's file. I did not find any notes in Mr. Peluso's file that he suffered from mental illness. I do not recall Mr. Peluso saying that he suffered from mental illness or mental problems of any kind. Mr. Peluso wrote me several letters, and he never wrote that he had a mental health problem or mental illness. The content of his letters never led me to believe that he suffered from a mental illness. There was no evidence that Mr. Peluso suffered from a mental health problem.

3. The applicant has alleged that he suffers from an adjustment disorder and that you failed to present this mitigating evidence to the Court. Please state whether you were aware of the applicant's mental disorder and whether you felt that this evidence would be mitigating if presented to the jury at punishment.

I was not aware that Mr. Peluso was diagnosed with an adjustment disorder. During one of our meetings at the jail, I asked Mr. Peluso to identify for me some things that might help the jurors understand why he deserved a shorter sentence, rather than a long one, particularly since he had only been out on parole for two months, after serving five years of a fifteen year sentence for burglary of a habitation. I recall Mr. Peluso's only reasons being that he was sorry, that he did not mean to hurt anyone, that he was willing to pay restitution, and that he wanted to be around to raise his daughters. Moreover, it was part of my trial strategy for Mr. Peluso to take responsibility for his actions, rather than attempting to excuse them.

4. Did you consult with a mental health expert regarding the applicant's case? Why or why not?

No. I did not consult with a mental health expert because there was no evidence or indication that Mr. Peluso had a mental health issue. At our first meeting, Mr. Peluso told me that he knew what he did was wrong, and that he would sign a plea bargain for prison time. In our meetings, Mr. Peluso was rational and had a clear understanding of the facts of his case. Mr. Peluso did not tell me that he had a mental health problem or mental illness, even when I asked Mr. Peluso if there was anything about his life that might make him more sympathetic to a jury. Also, in my professional experience, it is

> common for clients who suffer from a mental disease or disorder either volunteer their mental health diagnoses, report them when asked directly, or in some instances, blame their actions on their mental health diagnoses rather than criminal intentions. Mr. Peluso never did any of those things. Mr. Peluso's letters were rational, intelligently written, and did not lead me to believe that he suffered from a mental disease or defect either.

(Docket Entry No. 7-16, pp. 49-50).

The state habeas court found:

> 9. Shipman and the applicant decided that, after the State refused their final counter-offer in the plea bargaining process, the best course of action would be to accept responsibility and plead with the jury for mercy.

> 10. The applicant failed to provide Shipman with mitigating circumstances or evidence beyond his substance abuse problem.

> 11. Shipman reasonably believed that, given the strength of the State's case, the best defense available would be for the applicant to appear apologetic and not shift blame away from himself.

In *Strickland,* 466 U.S. at 691, the Supreme Court explained that:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

*Id.* at 691.

The record supports the state court's finding that defense counsel's failure to present evidence of Peluso's mental history did not make her representation deficient. The state habeas court found the facts stated in trial counsel's affidavit to be true and concluded that Peluso had received

reasonably effective assistance of counsel. The Court of Criminal Appeals expressly based its denial

of habeas relief on these findings. These determinations are entitled to a presumption of correctness.

28 U.S.C. § 2254(e)(1); *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g). Peluso

has not produced clear and convincing evidence to rebut these findings. He is not entitled to the

relief he seeks on this ground.

### C.   The Claim that Counsel was Deficient for Failing to Give Accurate Advice About the Guilty Plea

Peluso alleges that his trial counsel advised him to enter an "open" plea of guilty, with no

sentencing cap. Peluso contends that this was unreasonable advice, given the enhancement charge

that exposed him to a 99-year sentence.

Peluso points to the following statement in counsel's affidavit: "Mr. Peluso's case was one

of the worst police chases I have seen in my career practicing criminal law, both as a prosecutor and

a defense attorney. The video was terrifying to watch." Peluso argues that an open plea was an

invitation to have the jury impose an excessively long prison term. Peluso argues that this advice

had no strategic value because it simply "jumped" the liability phase, and Peluso would have been

in the same situation had he gone to trial and been convicted. Peluso argues that counsel put

someone who suffered from confusion, dysphoria, and an adjustment disorder on the witness stand

and hoped that he appeared apologetic.

In her affidavit, counsel responded to the habeas court's question, as follows:

> 5. Please describe your conversations with the applicant regarding
> his decision to plead guilty without an agreed recommendation as to
> punishment. Did you feel that such a plea was in his best interests
> even though he was facing a potential life sentence for the count of
> aggravated assault? What factors went into your decision to advise

him to plead guilty and proceed to a jury trial on punishment only?
Please describe in full your rationale.

At our first meeting, Mr. Peluso told me that he knew what he did
was wrong, and that he was willing to plead guilty and go to prison.
Mr. Peluso was on parole at the time of the offense, having served
five years of a fifteen year sentence for burglary of a habitation. At
the time of the offenses, he had only been paroled out of prison for
about eight weeks. We discussed his parole, and I told him that in my
professional opinion it would likely be revoked if he pleaded guilty
to anything. I also told him that in my professional opinion, the fact
that he had only been on parole for about two months before these
offenses would weigh heavily against Mr. Peluso with the District
Attorney and at trial. We talked about the Court's ability to cumulate,
or stack, any sentence that he received on top of his existing burglary
sentence. In my discussions with the prosecutors assigned to the case,
they believed that they had a strong case against Mr. Peluso, and that
he was likely to receive a long sentence at trial. The prosecutor
believed that their case was so strong that the initial offer for a plea
bargain was for fifty (50) years in prison. I informed Mr. Peluso of
their position, and the offer.

Mr. Peluso and I discussed the facts of his case, the likely testimony
of the police officers, and the civilian witnesses, the injuries suffered
by the complainant, and the video recordings of the incident. The
videos showed that on March 21, 2010, Mr. Peluso was driving a
pickup truck through downtown Conroe when an officer attempted to
make a traffic stop on the vehicle that he was driving. The truck was
stolen. Mr. Peluso evaded detention, and a car chase ensued. The
pursuit started approximately one block from the courthouse, and
took place over many miles, most of which were in heavy traffic. The
videos showed Mr. Peluso driving, at many times into oncoming
traffic, at speeds exceeding 105 miles per hour, while being chased
by numerous law enforcement personnel. The pursuit went on for
over 18 minutes. It culminated in Mr. Peluso running a stop sign in
downtown Conroe at the intersection of Highway 105 and a side
street while traveling more than 50 miles per hour. The force of the
impact thrust the complainant's vehicle into a tree, and nearly causing
both vehicles to drive into a downtown business. After the accident,
Mr. Peluso jumped out of the stolen truck he was driving and fled on
foot. He was pursued by the driver of the vehicle he struck and law
enforcement personnel. There was no legal defense available to Mr.

Peluso, and because the entire offense was on video, the evidence of guilt was overwhelming.  All of this was on the video recordings.

Mr. Peluso's case was one of the worst police chases I have seen in my career practicing criminal law, both as a prosecutor and a defense attorney.  The video was terrifying to watch.  Mr. Peluso's only explanation for his actions was that he had been using drugs and panicked.  He maintained that he did not know that the truck was stolen, because he had borrowed it from a man named Kyle.  He did not know anything else about Kyle, other than his name.  In my professional opinion, due to the overwhelming evidence against Mr. Peluso, he would have been found guilty if he pleaded not guilty.  The State's initial offer for a plea bargain was for 50 years in prison, and the State was not willing to agree to our final counter offer of 15 years on an aggravated sentence or 20 years on a non-aggravated sentence.  When discussing plea bargains, it is my practice to inform every client of all of their options, including a jury trial with the Court assessing punishment, a jury trial with the jury assessing punishment, a bench trial, an open plea to the court, or an open plea to the jury.  After our final counter offer, the prosecutor refused to negotiate further.  Because Mr. Peluso did not want to accept the State's plea bargain offer, and the State was unwilling to negotiate further, a trial of some sort was our only option.  Mr. Peluso's position was that if the prosecutor was not willing to agree to our counter-offer, then he wanted a jury to decide his punishment.  He chose to enter a plea of guilty and have the jury assess his punishment.

Mr. Peluso and I discussed his prior criminal history, his status as a repeat offender, and how it could be used to enhance the punishment range.  I advised Mr. Peluso that if he proceeded without an agreed recommendation that he would open himself to the entire range of punishment.  Mr. Peluso was aware that it was possible for him to receive life in prison.  Though he was aware of the facts, and I had informed him of the negative factors that would affect his sentence, Mr. Peluso believed that he did not deserve a sentence as long as the one offered by the State because he did not intend to hurt anyone.  After discussing all of his options, and the lack of possible defenses, Mr. Peluso elected to proceed with an open plea to the jury.

In my professional opinion, the evidence against Mr. Peluso was so strong that if he pled not guilty, then the jury would be been angered by his failure to take responsibility for his actions.  As part of my trial strategy, I believed Mr. Peluso would present well as an apologetic,

well-spoken man who suffered from a life-long substance abuse problem. In arriving at that recommendation, I considered the overwhelming evidence of his guilt, the lack of possible defenses based upon Mr. Peluso's statements to me, the lack of suitable witnesses Mr. Peluso identified to testify on his behalf in punishment who were willing to come forward, his lengthy previous criminal history, and the evidence that was likely to be admitted during the punishment phase of the trial after he was found guilty. In my professional opinion, the jury would have given him a life sentence, rather than the 55 years that the jury assessed if he had not taken an apologetic position.

(Docket Entry No. 7-16, pp. 50-51).

The state habeas court found the facts stated in trial counsel's affidavit to be true and concluded that Peluso had received reasonably effective assistance of counsel. The Court of Criminal Appeals expressly based its denial of habeas relief on this finding. These determinations are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Moore v. Johnson,* 194 F.3d 586, 604 (5th Cir. 1999) (op. on reh'g). Peluso has not produced clear and convincing evidence to rebut this finding.

The record shows that defense counsel discussed the options available to Peluso. Because he was unwilling to accept the State's plea offer of a 55-year sentence, counsel recommended that the best option was to plead guilty and have the jury assess his punishment. In light of Peluso's lengthy criminal history, spanning over 15 years, counsel concluded that it would be better for Peluso to acknowledge his criminal history and ask the jury for mercy. Counsel reasonably concluded that if Peluso accepted responsibility and showed repentance and remorse, the jury would assess a less harsh sentence. The jury imposed a 55-year sentence, in the middle of the available range.

The state habeas court's decision was not contrary to clearly established federal law. Peluso is not entitled to habeas relief on this ground. 28 U.S.C. § 2254(d)(1).

## IV.     Conclusion

The respondent's Motion for Summary Judgment, (Docket Entry No. 8), is granted. Peluso's petition for a writ of habeas corpus is denied.  This case is dismissed.  Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a certificate of appealability from a district court's denial of habeas relief. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322 (2003)(citing 28 U.S.C. § 2253(c)(1)).  A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims."  *Id.*  Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Id.* at 1040 (citing *Slack v. McDaniel,* 529 U.S. 473, 484).

A district court may deny a certificate of appealability on its own, without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  The court finds that

Peluso has not made "a substantial showing of the denial of a constitutional right," and will not issue a certificate of appealability.

SIGNED on February 23, 2015, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge